GRIFFIS, J., CONCURRING IN PART AND DISSENTING IN PART:
 

 ¶40. This interlocutory appeal considers whether the circuit court correctly granted the motions to dismiss for failure to state a claim under Mississippi Rule of Civil Procedure 12(b)(6) filed by Anheuser-Busch and the Mitchell Companies.
 
 [4]
 

 ¶41. As to Anheuser-Busch, the majority makes two rulings that conflict. First, the majority reverses the circuit court's decision in favor of Anheuser-Busch on Rex's statutory claim under the Mississippi Beer Industry Fair Dealing Act (BIFDA).
 
 See
 

 Miss. Code Ann. §§ 67-7-1
 
 to -23 (Rev. 2012). The majority concludes, as a matter of law, that BIFDA "rendered the match-and-redirect provision null and void ...." Maj. Op. ¶ 17. I disagree with and dissent from this holding.
 

 ¶42. Next, the majority finds that the circuit court correctly dismissed the breach-of-contract claim because Rex asserted a claim under the "disapproval" or "same price" provision of the Wholesaler Equity Agreement (Paragraph 4(b)(v)) and not under the "match and redirect" provision (Paragraph 4(d)). I concur with this holding and the majority's decision to affirm the dismissal of the "other claims" against Anheuser-Busch.
 

 ¶43. I disagree with and dissent from the majority's holding that the circuit court erred in granting a motion to dismiss as to the Mitchell Companies. I would affirm the dismissal of the Mitchell Companies.
 

 I. Standard of Review
 

 ¶44. A motion to dismiss for failure to state a claim tests the legal sufficiency of the complaint.
 
 Lagniappe Logistics, Inc. v. Buras
 
 ,
 
 199 So.3d 675
 
 , 677 (Miss. 2016). We do not defer to the trial court's ruling.
 
 Jourdan River Estates, LLC v. Favre
 
 ,
 
 212 So.3d 800
 
 , 803 (Miss. 2015). If the issue presented is a question of law, we review it de novo.
 

 Id.
 

 If the issue is a question of fact, we limit our review to the face of the complaint, and we accept the allegations of the Complaint as true.
 
 City of Meridian v. $104,960.00 U.S. Currency
 
 ,
 
 231 So.3d 972
 
 , 974 (Miss. 2017). A Rule 12(b)(6) motion to dismiss should not be granted unless "it appears beyond a reasonable doubt that the plaintiff will be unable to prove any set of facts in support of the claim."
 
 City of Meridian
 
 ,
 
 231 So.3d at
 
 974 (citing
 
 Rose v. Tullos
 
 ,
 
 994 So.2d 734
 
 , 737 (Miss. 2008) ).
 

 II. Claims Asserted Against Anheuser-Busch
 

 ¶45. The majority begins its analysis with the BIFDA claim. Two applicable contracts govern the analysis of this claim. In 1997, Rex and Anheuser-Busch entered the "Amended and Restated Anheuser-Busch, Inc. Wholesaler Equity Agreement." Then, in 2016, Rex and Adams Beverages of Mississippi, LLC, entered an Asset Purchase Agreement.
 

 ¶46. Our review should start with an analysis of Rex's claims against Anheuser-Busch for breach of contract.
 

 A. Breach-of-Contract Claim
 

 ¶47. The majority correctly rules that the circuit court properly dismissed Rex's breach-of-contract claim against Anheuser Busch. My analysis differs slightly.
 

 ¶48. Count I of the Complaint alleges,
 

 [Anheuser-Busch]'s Breach of Contract Claim
 

 65. Rex and [Anheuser-Busch] entered a Wholesaler Equity Agreement. The Wholesaler Equity Agreement was a valid and binding contract between Rex and [Anheuser-Busch]. The provisions of the Wholesaler Equity Agreement govern [Anheuser-Busch]'s exercise of "match and redirect" rights with respect to Rex's sale of its business.
 

 66. Specifically, the Wholesaler Equity Agreement requires that if "[Anheuser-Busch] disapproves a proposed owner ... and if a sale is eventually completed to a party preferred and designated by [Anheuser-Busch], then [Anheuser-Busch]
 
 shall ensure that the selling Wholesaler receives the same price
 
 , net of taxes, Wholesaler would have received from the disapproved purchaser."
 

 67. The Wholesaler Equity Agreement gives [Anheuser-Busch] the right and option to purchase Rex's ownership interest, but only "at the
 
 price and on the terms and conditions applicable to such proposed [transfer]
 
 , subject to the following: ... [Anheuser-Busch] may assign such right to any third party selected by [Anheuser-Busch], so long as [Anheuser-Busch] ... remains liable to [Rex] for payment of the purchase price, if such third party violates its obligation to pay such purchase price to Wholesaler."
 

 68. [Anheuser-Busch] assigned its right to purchase Rex's distributorship to Mitchell, but [Anheuser-Busch] did not ensure that Rex received the same price it would have received from Adams. [Anheuser-Busch] breached the Wholesaler Equity Agreement.
 

 69. [Anheuser-Busch] is liable to Rex for all damages caused by its breach of the Wholesaler Equity Agreement, including the loss of the full purchase price.
 

 (Emphasis added.)
 

 ¶49. These allegations refer to two provisions of the Wholesaler Equity Agreement: (1) the "disapproval" or "same price" provision in Paragraph 4(b)(v), and (2) the "match and redirect" provision in Paragraph 4(d). In relevant part, these provisions state,
 

 4. Ownership of Wholesaler
 

 Although this is a personal service agreement and the participation of Manager is vital to both parties, the ownership of Wholesaler is also important because it is the owner or owners who have the right to establish basic policies and have the responsibility of providing financing, personnel, equipment and facilities for the effective operation of the business .... Therefore, because the participation of the owner(s) could also have a significant effect on the sale of Anheuser-Busch Products and the performance of this Agreement, the parties agree as follows:
 

 (a) Unless Wholesaler shall have followed the procedures set forth in subparagraphs (b) and (c) below, this Agreement shall immediately terminate pursuant to the terms of paragraph 6 whenever there is a change of ownership in Wholesaler's business ....
 

 (b) A change of ownership of Wholesaler's business is a matter of vital concern to both Anheuser-Busch and Wholesaler. Anheuser-Busch recognizes Wholesaler's desire to obtain the best available price for its business. Wholesaler understands that the ability of Anheuser-Busch
 to successfully market its Products in the Territory is dependent upon the financial, marketing and other qualifications of the prospective purchaser of Wholesaler's business. The parties acknowledge that these objectives are not mutually exclusive and recognizing Wholesale's desire to obtain the best available price for Wholesaler's business from a purchaser who is fully qualified to market the Products and fulfill the obligations set forth in this Agreement, they agree that the following provisions are necessary and desirable for both Wholesaler and Anheuser-Busch:
 

 (i)
 
 If an owner of Wholesaler desires to sell, transfer or otherwise dispose of any interest in Wholesaler, then Wholesaler shall notify Anheuser-Busch by submitting a Notice of Intent to Sell
 
 ... prior to the commencement of any negotiations or related discussions with any prospective purchaser or other third party .... Wholesaler shall cooperate with Anheuser-Busch and provide it with such information as Anheuser-Busch may require in order to extend an offer to purchase such interest in the business. If such discussions result in an agreement between Wholesaler and Anheuser-Busch, the parties shall promptly effectuate such agreement.
 

 ....
 

 (iv) In determining whether to approve or disapprove, as the case may be, a proposed purchaser of an ownership interest in Wholesaler's business, Anheuser-Busch shall be concerned with the qualifications of the proposed purchaser to fulfill the obligations of this Agreement and the effects of the resulting business combination, including but not limited to, the resulting Territory configuration (if the proposed purchaser is already an Anheuser-Busch wholesaler) and the potential advantages and disadvantages of market combinations. In evaluating the proposed owner's qualifications, Anheuser-Busch may consider such factors as it deems appropriate ....
 

 (v)
 
 If Anheuser-Busch disapproves a proposed owner in Wholesaler's business solely because of
 
 (A) concern with the resulting Territory configuration or (B) market combinations to achieve economies of scale or enhanced sales opportunities, and if a sale is eventually completed to a party preferred and designated by Anheuser-Busch, then
 
 Anheuser-Busch shall ensure that the selling Wholesaler receives the same price, net of taxes, Wholesaler would have received from the disapproved purchaser.
 

 ....
 

 (d) At any time prior to the date on which Anheuser-Busch approves or disapproves a proposed transfer of an ownership interest in Wholesaler's business,
 
 Anheuser-Busch shall have the right and option to purchase this ownership interest at the price and on the terms and conditions applicable to such proposed change
 
 , subject to the following:
 

 ....
 

 (ii) Anheuser-Busch shall exercise its rights to purchase such ownership interest under this subparagraph 4(d) by notifying Wholesaler in writing. Subject to subparagraph 4(d)(iii) below, upon receipt of such notice Wholesaler agrees to promptly execute such documents and take such actions as may reasonably be required to transfer such ownership as contemplated herein.
 

 ....
 

 (iv) After notifying Wholesaler that Anheuser-Busch intends to exercise
 its right to purchase such ownership interest of Wholesaler in accordance with this subparagraph 4(d),
 
 Anheuser-Busch may assign such right to any third party selected by Anheuser-Busch
 
 , so long as Anheuser-Busch (A) assigns this right to a third party legally qualified to purchase and operate the business of Wholesaler under the laws of the applicable State, and (B)
 
 remains liable to Wholesaler for payment of the purchase price, if such third party violates its obligation to pay such purchase price to Wholesaler.
 

 (Emphasis added.)
 

 ¶50. After considering the motion to dismiss, the circuit court ruled,
 

 Count I, Breach of Contract, alleges [Anheuser-Busch] breached the Wholesaler Equity Agreement. Rex put its business up for sale to the highest and best bidder, which it considered to be Adams. The Wholesaler Equity Agreement Rex had with [Anheuser-Busch] provided that [Anheuser-Busch] had to approve the purchase or it could "match and redirect" it. Prior to the sale's completion, [Anheuser-Busch] exercised this right and redirected the sale of Rex's [Anheuser-Busch] distributorship to Mitchell. Pursuant to the agreement [Anheuser-Busch] had to ensure that the sale was "at the price and on the terms and conditions" as set forth in the Asset Purchase Agreement between Rex and Adams. Adams had offered Rex a total of $ 50.5 million, which Rex claims is the "price" it was entitled to receive from Mitchell. However, before the sale of assets by Rex to Mitchell was consummated, Yuengling, another of Rex's suppliers, withheld its consent to the sale and terminated its contractual relationship with Rex. As a result Rex did not have a Yuengling distributorship to transfer to Mitchell. The Asset Purchase Agreement provides that if one of Rex's suppliers refuses to give consent to the transaction "then the purchase price shall be reduced by the portion of the purchase price attributable" to such supplier. The Yuengling distributorship rights were valued at $ 3.1 million which were the deducted from the offered price of $ 50.5 million. The sale to Mitchell was then completed. Rex is attempting to recover the $ 3.1 million.
 

 Rex specifically agreed to the terms and conditions of the sale by executing the two contracts. [Anheuser-Busch] did not breach its contract with Rex because [Anheuser-Busch] exercised its lawful contractual right to "match and redirect" the sale from Adams to Mitchell under the "terms and conditions" of the contracts. The Court further notes that even though Rex claims that it was "forced" to conclude the sale from Rex to Mitchell, in fact, Rex voluntarily concluded the sale. Rex took the risk that Yuengling would not approve if AB decided to match and redirect.
 

 ¶51. The circuit court was correct to rule that the allegations of the Complaint established that Anheuser-Busch exercised its rights under the "match and redirect" provision (Paragraph 4(d)). And the circuit court was correct to rule that Anheuser-Busch was obligated to Rex "for payment of the purchase price, if such third party violates its obligation to pay such purchase price to Wholesaler." The Complaint alleged that Rex received payment of $ 47.4 million of the original purchase price of $ 50.5 million. Rex contends that it lost $ 3.1 million because Yuengling did not consent to the sale of Rex's Yuengling distributorship to the Mitchell Companies.
 

 ¶52. The Complaint alleged that, under Paragraph 4(d), Anheuser-Busch had the right to purchase Rex's "ownership interest
 at the price and on the terms and conditions applicable to such proposed change" and that Anheuser-Busch "remains liable to [Rex] for payment of the purchase price." For this, Rex was paid $ 47.4 million.
 

 ¶53. As to the loss of $ 3.1 million because Yuengling did not consent to the sale to the Mitchell Companies, the Asset Purchase Agreement provided in Section 5.1(d) that
 

 Consents. Payoff Letters, and Releases Not Obtained at Closing .... If any Supplier other than Anheuser Busch expressly refuses to deliver a Consent ..., or has conditioned consent on conditions that are unacceptable to Purchaser, in Purchaser's sole discretion (in either event a "Rejection", and such Brand for which such Supplier has refused to give Consent shall be an "Excluded Brand"), then
 
 the Purchase Price shall be reduced by the portion of the Purchase Price attributable to such Excluded Brand
 
 , and [Adams] shall not be required to sell and Purchaser shall not be required to purchase such Excluded Brand or any Inventory associated with such Excluded Brand, if such third party violates its obligation to pay such purchase price to Wholesaler.
 

 (Emphasis added.)
 

 ¶54. Yuengling did not consent. Under Section 5.1(d) of the Asset Purchase Agreement, "then the Purchase Price shall be reduced by the portion of the Purchase Price attributable to such Excluded Brand." The circuit court was correct to rule, as a matter of law under the Mississippi Rule of Civil Procedure 12(b)(6) standard, that Rex did not have a contractual right to receive the $ 3.1 million that Adams had agreed to pay for the Yuengling distributorship.
 

 ¶55. The circuit court's analysis was correct and should be affirmed. Because this is consistent with the majority's holding, I concur.
 

 B. Violation of Beer-Industry-Fair-Dealing-Act Claim
 

 ¶56. Having determined that Anheuser-Busch did not breach the terms of the Wholesaler Equity Agreement, we should then consider whether Anheuser-Busch violated BIFDA.
 

 ¶57. Count V of the Complaint alleges,
 

 [Anheuser-Busch]'s Violation of Beer Industry Fair Dealing Act
 

 87. The Mississippi Beer Industry Fair Dealing Act states that a supplier "shall not interfere with, prevent or unreasonably delay the transfer of the wholesaler's business, including an assignment of wholesaler's rights under the agreement, if the proposed transferee is a designated member, or if the transferee other than a designated member meets such nondiscriminatory, material and reasonable qualifications and standards." Miss. Code. Ann. § 67-7-13(2).
 

 88. Adams was a qualified transferee under § 67-7-13 because at all material times Adams met [Anheuser-Busch]'s "nondiscriminatory, material and reasonable qualifications and standards."
 

 89. [Anheuser-Busch] had no good cause related to "nondiscriminatory, material and reasonable qualifications and standards" to refuse to accept the transfer of Rex's business to Adams. [Anheuser-Busch]'s refusal to accept the transfer of Rex's business to Adams was in bad faith.
 

 90. As a result of [Anheuser-Busch]'s violation of § 67-7-13(2), Rex lost the full purchase price of its sales contract with Adams, and incurred damages of at least $ 3. l million.
 

 91. [Anheuser-Busch] is liable under § 67-7-21(2) for all damages incurred by Rex as a result of its violation of
 § 67-7-13(2) as well as court costs and reasonable attorneys' fees.
 

 ¶58. After considering the motion to dismiss, the circuit court ruled,
 

 Count V alleges Violations of Mississippi's Beer Industry Fair Dealing Act [BIFDA]. It is Rex's position that AB violated
 
 Miss. Code Ann. § 67-7-13
 
 (2) by refusing to accept the transfer of Rex's business to Adams. The section states that a supplier "shall not interfere with, prevent or unreasonably delay the transfer of the wholesaler's business, including an assignment of wholesaler's rights under the agreement, if the proposed transferee is a designated member, or if the transferee other than a designated member meets such nondiscriminatory, material and reasonable qualifications and standards." Rex transferred its business to Mitchell under the same terms and conditions that it negotiated with Adams for the AB assets. Yuengling terminated Rex's right to distribute Yuengling products and transferred those assets to another wholesaler. Thus there was no violation of BIFDA.
 

 ¶59. The majority concludes the circuit court committed reversible error as to this issue. The majority rules that "BIFDA rendered the match-and-redirect provision null and void, and Anheuser-Busch's demands premised on the void provision may have amounted to unjustified 'interference' with Rex's transfer to Adams ...." Maj. Op. ¶ 17.
 

 ¶60. This finding is in conflict or inconsistent with the majority's findings on Count 1-Breach of Contract. If the "match and redirect" provision is "null and void" under BIFDA, then it could not also be enforceable in the same action.
 

 ¶61. I agree with the majority that no Mississippi court has interpreted Mississippi Code Section § 67-7-13(2). Yet, with no supporting authority, the majority concludes that Anheuser-Busch's decision to exercise its contractual rights in the Wholesaler Equity Agreement "prevented" and "interfered" with Rex's intended transfer to Adams.
 

 ¶62. We start with Section 67-7-13 :
 

 Transfer of business and assignment of rights of wholesalers.
 

 (1) Upon written notice of intent to transfer the wholesaler's business, any individual owning ... may transfer the wholesaler's business to a designated member, or to any other person who meets the nondiscriminatory material and reasonable qualifications and standards required by the supplier for similarly situated wholesalers. The consent or approval of the supplier shall not be required of any transfer of the wholesaler's business, including the assignment of the wholesaler's rights under the agreement, to a designated member or shall not be withheld or unreasonably delayed to a proposed transferee who meets such nondiscriminatory, material and reasonable qualifications and standards ....
 

 ....
 

 (2)
 
 The supplier shall not interfere with, prevent
 
 or unreasonably delay
 
 the transfer of the wholesaler's business
 
 , including an assignment of wholesaler's rights under the agreement, if the proposed transferee is a designated member, or if the transferee other than a designated member meets such nondiscriminatory, material and reasonable qualifications and standards required by the supplier for similarly situated wholesalers.
 
 Where the transferee is other than a designated member, the supplier may in good faith and for good cause related to the reasonable qualifications refuse to accept the transfer of the wholesaler's business or
 

 the assignment of the wholesaler's rights under the agreement.
 

 Miss. Code Ann. § 67-7-13
 
 (Rev. 2012) (emphasis added).
 

 ¶63. Under Section 67-7-13(2), Anheuser-Busch "shall not interfere with, prevent or unreasonably delay the transfer of [Rex]'s business."
 

 Id.
 

 A proper statutory interpretation does not stop there.
 

 ¶64. The second sentence of Section 67-7-13(2) provides that Anheuser-Busch may "refuse to accept the transfer of [Rex]'s business or the assignment of [Rex]'s rights under the agreement."
 
 [5]
 
 Under the second sentence of Section 67-7-13(2), Anheuser-Busch took an action to "match and redirect" the sale to the Mitchell Companies. Anheuser-Busch's (and the Mitchell Companies') actions were indeed lawful under the Wholesaler Equity Agreement and BIFDA.
 

 ¶65. If we must delve into the definition of "interfere," Mississippi courts have considered and interpreted the term "interference." In
 
 Par Industries, Inc. v. Target Container Co.
 
 ,
 
 708 So.2d 44
 
 , 48 (Miss. 1998), this Court considered the tort of "interference" with performance of a contract. The Court ruled,
 

 When a person causes another to breach a contract with some third person, the tort is one of interference with performance of a contract. The four elements for this tort are: "(1) that the acts were intentional and willful; (2) that they were calculated to cause damage to the plaintiffs in their lawful business; (3)
 
 that they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice)
 
 ; and (4) that actual damage and loss resulted."
 
 Cenac v. Murry
 
 ,
 
 609 So.2d 1257
 
 , 1268-69 (Miss.1992) (citing
 
 Liston v. Home Ins. Co.
 
 ,
 
 659 F.Supp. 276
 
 , 281 (S.D. Miss. 1986) ).
 

 Par Indus., Inc.
 
 ,
 
 708 So.2d at 48
 
 (emphasis added). Clearly, the third element is the Court's interpretation or pronouncement as to what conduct constitutes "interference."
 

 ¶66. For there to be "interference," there must be some action that is "done with the
 
 unlawful purpose
 
 of causing damage or loss, without right or justifiable cause on the part of the defendant (which constitutes malice)."
 

 Id.
 

 (emphasis added) (quoting
 
 Cenac
 
 ,
 
 609 So.2d at
 
 1268-69 ). I am of the opinion that Anheuser-Busch's actions, undertaken under a contractual right, cannot and should not be considered "interference." Moreover, Anheuser-Busch did not act to cause Rex "damage or loss." In fact, as discussed above, Anheuser-Busch had to pay Rex the amount of compensation that Adams was obligated to pay.
 

 ¶67. As to the word "prevent," the sale was consummated consistent with the terms of the Asset Purchase Agreement; just not to Adams.
 

 ¶68. The circuit court was correct to find that Anheuser-Busch was not in violation of BIFDA. I respectfully dissent from the majority's decision to reverse and remand the dismissal of Rex's claim against Anheuser-Busch for a violation of BIFDA.
 

 C. Other Claims Against Anheuser-Busch
 

 ¶69. I concur with the majority's decision that Rex has failed to properly raise the circuit court's dismissal of other claims asserted against Anheuser-Busch. Rex neither argued nor cited authority to contest
 the dismissal of its claims against Anheuser-Busch for bad faith breach of contract, tortious interference with contract, civil conspiracy, or punitive damages.
 

 ¶70. As to the claim that Anheuser-Busch tortiously interfered with its contract, I would add that clear legal authority contradicts Rex's position. In
 
 Cenac
 
 , the Court explained,
 

 [A] cause of action exists by a party to a contract against some third, outside person who causes the party not to perform. Thus, in order to pursue a cause of action, it is accepted that the wrongdoer is a "stranger" to the contract which was interfered with-an outsider. "A party to a contract cannot be charged with interfering with his own contract." As the tort of interference with contract has evolved, it is settled that, "[a] defendant's breach of his own contract with the plaintiff is of course not a basis of the tort." Therefore, tortious interference with performance of a contract is unavailable as a theory of relief for the Cenacs in that the wrongdoer (Murry) is also a party to the contract.
 

 Cenac
 
 ,
 
 609 So.2d at 1269
 
 (second alteration in original) (citations omitted). Indeed, if Anheuser-Busch had breached its contract with Rex, the breach would not be a tort.
 

 Id.
 

 "His remedy is in contract and for breach." James L. Robertson,
 
 The Law of Business Torts in Mississippi
 
 , 15 Miss. College L. Rev. 331, 360 (1995).
 

 III. Claims Asserted Against the Mitchell Companies
 

 A. Claims Against Mitchell Distributing Company, Inc.
 

 ¶71. The Complaint identified the Mitchell Companies as follows:
 

 Defendants Mitchell Beverage, LLC, Mitchell Rex Distributing, LLC, and Mitchell Distributing Company, Inc. (collectively, "Mitchell") are two Mississippi limited liability companies and one Mississippi corporation, respectively, that operate as a single business enterprise or joint venture.
 

 The Complaint did not specify any separate conduct or actions by these individual legal entities. Mitchell Distributing Company, Inc., filed a separate motion to dismiss under Rule 12(b)(6). The circuit court ruled,
 

 Plaintiff has alleged that Mitchell Distributing, Mitchell Beverage, LLC, and Mitchell Rex Distributing, LLC, "operate as a single business enterprise or joint venture." Such an accusation would require piercing the corporate veil. Piercing the corporate veil is reserved for "those extraordinary factual circumstances where to do otherwise would subvert the ends of justice."
 
 Gray v. Edgewater Landing, Inc.
 
 ,
 
 541 So.2d 1044
 
 , 1046 [ (Miss. 1989) ] (citing
 
 Johnson & Higgins of Miss., Inc. v. Comm'r of Ins.
 
 ,
 
 321 So.2d 281
 
 , 284 (Miss. 1975) ). A corporate entity will not be disregarded in contract claims unless the complaining party can demonstrate: (1) some frustration of expectations regarding the party to whom he looked for performance: (2) the flagrant disregard of corporate fom1alitics by the defendant corporation and its principals; and (3) a demonstration of fraud or other equivalent misfeasance on the part of the corporate shareholder.
 
 Gray
 
 ,
 
 541 So.2d at 1047
 
 .
 
 Penn Nat. Gaming, Inc. v. Ratliff
 
 ,
 
 954 So.2d 427
 
 , 431 (Miss. 2007). Plaintiff alleges nothing beyond the allegation that these entities "operate as a single business or joint venture." This conclusory allegation fails to establish a potential "single business" claim against Mitchell Distributing.
 

 The joint venture allegation also fails. The critical elements of the existence of
 a joint venture are (1) intent (2) control, and (3) profit sharing.
 
 Mayer v. Angus
 
 ,
 
 83 So.3d 444
 
 (Miss. Ct. App. 2012). This complaint fails to make any assertion regarding the corporations which could lead to the proof required to establish that a joint venture exists. Plaintiff's single allegation fails to allege a claim that would entitle plaintiff to a finding that the corporations were involved in a joint venture.
 

 ¶72. It is important to note that Rex does not challenge this ruling.
 

 B. Claim for Tortious Interference with Contract
 

 ¶73. Count III of the Complaint alleged,
 

 [Anheuser-Busch]'s and Mitchell's Tortious Interference with Contract
 

 74. Rex had a valid and enforceable agreement to sell its distributorship to Adams for $ 50.5 million.
 

 75. [Anheuser-Busch] and Mitchell interfered with that agreement through an intentional and willful scheme to redirect the sale of Rex's business from Adams to Mitchell.
 

 76. [Anheuser-Busch] and Mitchell were aware that redirecting the sale of Rex's business to Mitchell would cause Rex to lose the ability to sell its Yuengling distribution rights, which were worth at least $ 3. l million.
 

 77. Based on information and belief, the purpose of [Anheuser-Busch] and Mitchell's interference was to reward Mitchell and marginalize Yuengling - to [Anheuser-Busch]'s benefit, at Rex's expense. [Anheuser-Busch] and Mitchell's interference prevented Rex from transferring its Yuengling distribution rights to another distributor who could distribute Yuengling over Rex's entire territory. [Anheuser-Busch] and Mitchell therefore knew that Rex would be damaged by their actions.
 

 78. But for [Anheuser-Busch] and Mitchell's interference, Rex would have consummated its sale to Adams and received the full $ 50.5 million purchase price. [Anheuser-Busch] and Mitchell's interference is the proximate cause of Rex's $ 3.1 million loss.
 

 79. [Anheuser-Busch] and Mitchell are jointly and severally liable to Rex for all damages caused by their tortious interference with Rex's agreement with Adams.
 

 ¶74. There are four elements to a claim for tortious interference with contract:
 

 1. that the acts were intentional and willful;
 

 2. that they were calculated to cause damage to the plaintiffs in their lawful business;
 

 3. that they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice); and
 

 4. that actual damage and loss resulted.
 

 Cenac
 
 ,
 
 609 So.2d at 1268-69
 
 (quoting
 
 Liston
 
 ,
 
 659 F.Supp. at
 
 281 )).
 

 ¶75. The Mitchell Companies contend that Rex cannot establish the third element of this tort: "that they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice)."
 

 Id.
 

 (quoting
 
 Liston
 
 ,
 
 659 F.Supp. at
 
 281 ).
 

 ¶76. The only authority cited by the majority is that "Rex alleged Mitchell was a joint tortfeasor and is liable for Anheuser-Busch's wrongful acts." Maj. Op. ¶ 27.
 
 See
 

 D & W Jones, Inc. v. Collier
 
 ,
 
 372 So.2d 288
 
 , 292 (Miss. 1979) ("All who actively participate in any manner in the commission of a tort, or who command, direct, advise, encourage, aid or abet its commission, are jointly and severally liable therefor."
 

 (quoting
 
 Hutto v. Kremer
 
 ,
 
 222 Miss. 374
 
 ,
 
 76 So.2d 204
 
 , 208 (1954) )).
 

 ¶77. The Complaint does not assert any factual allegations that would establish an "unlawful purpose" or that the Mitchell Companies actions were "without right or justifiable cause." Considering all factual allegations in the Complaint in the light most favorable to Rex, there are simply no facts that would support a finding that the Mitchell Companies acted with an unlawful purpose.
 

 ¶78. The fact that the Mitchell Companies are engaged in the business of a beer distributorship is not unlawful. The fact that the Mitchell Companies were interested in purchasing another beer distributorship under the Anheuser-Busch brand is not unlawful. The fact that the Mitchell Companies entered an agreement with Anheuser-Busch to purchase the Rex distributorship after Anheuser-Busch exercised its contractual rights was not unlawful. In fact, Rex was paid the agreed-upon price.
 

 ¶79. Rex argues that the Mitchell's argument on this issue "splits hairs, unconvincingly." I disagree. As discussed above, since the circuit court was correct to dismiss Rex's claims against Anheuser-Busch, there is simply no basis to determine that Mitchell's actions were wrongful or unlawful. Mitchell had a "justifiable economic interest" to accept Anheuser-Busch's decision to match and redirect the purchase of Rex's assets.
 

 ¶80. I would affirm the circuit court's dismissal of the tortious-interference-with-contract claim against the Mitchell Companies.
 

 C. Claim for Civil Conspiracy
 

 ¶81. Count III of the Complaint alleged,
 

 [Anheuser-Busch]'s and Mitchell's Tortious Interference with Contract
 

 81. [Anheuser-Busch] and Mitchell conspired to redirect the sale of Rex's business from Adams to Mitchell.
 

 82. Based on information and belief, the purpose of AB and Mitchell's conspiracy was to reward Mitchell and marginalize Yuengling - to [Anheuser-Busch]'s benefit, at Rex's expense. AB and Mitchell's interference prevented Rex from transferring its Yuengling distribution rights to another distributor who could distribute Yuengling over Rex's entire territory. [Anheuser-Busch] and Mitchell therefore knew that Rex would be damaged by their actions.
 

 83. In furtherance of their conspiracy, in addition to many other overt acts, [Anheuser-Busch] exercised its match and redirect rights under the Wholesaler Equity Agreement to force Rex to sell its business to Mitchell, and Mitchell consummated that transaction.
 

 84. But for [Anheuser-Busch] and Mitchell's conspiracy, Rex would have consummated its sale to Adams and received the full $ 50.5 million purchase price. [Anheuser-Busch] and Mitchell's conspiracy is the proximate cause of Rex's $ 3.1 million loss.
 

 ¶82. The circuit court ruled,
 

 Rex also makes a conspiracy claim against Mitchell Beverage. A civil conspiracy claim requires "a combination of persons for the purpose of accomplishing an unlawful purpose or a lawful purpose unlawfully."
 
 Gallagher Basset
 
 [
 
 t
 
 ]
 
 Services, Inc. v. Jeffcoat
 
 ,
 
 887 So.2d 777
 
 , 786 (Miss. 2004). It requires "(1) an agreement between two or more persons, (2) an unlawful purpose, (3) an overt act in furtherance of the conspiracy, and (4) resulting damages to the plaintiff." Rex's claim for tortious interference fails. As a result, the claim for civil conspiracy cannot rest on that tort and also fails. See
 
 Wells v. Shelter General Ins. Co.
 
 , [217] F.Supp.2d 744, 755 (S.D. Miss. 2002). Mitchell Beverage
 lawfully assumed Adams's rights and obligations under the APA. The conclusory allegations do not support that any acts taken pursuant to the assignment or APA were done with an unlawful purpose. Given the failure of the tortious interference claim, there are insufficient allegations to support a conspiracy to tortiously interfere with Rex's contract with Adams. The only overt act Mitchell Beverage committed is that it agreed to step into Adams's position after [Anheuser-Busch] exercised its right to reassign the contract to another wholesaler. This is not a sufficient allegation to support a claim of civil conspiracy.
 

 ¶83. A conspiracy requires an agreement "to accomplish an unlawful purpose or a lawful purpose unlawfully ... and damages to the plaintiff as a proximate result."
 
 Bradley v. Kelley Bros. Contractors
 
 ,
 
 117 So.3d 331
 
 , 339 (Miss. Ct. App. 2013) (citing
 
 Jeffcoat
 
 ,
 
 887 So.2d at
 
 786 ).
 

 ¶84. As previously discussed, there was no action by the Mitchell Companies that was "to accomplish an unlawful purpose or a lawful purpose unlawfully." The fact that Mitchell was willing to have the sale redirected to it neither demonstrates an attempt to accomplish an unlawful purpose or an attempt to accomplish a lawful purpose unlawfully. Also important is that Rex received the compensation it was entitled to receive under the Asset Purchase Agreement. Even were there a civil conspiracy, no damages would have resulted.
 

 ¶85. I would affirm the circuit court's orders to dismiss the claims Rex asserted against Anheuser-Busch and the Mitchell Companies. Therefore, I concur in part and dissent in part.
 

 KING, P.J., JOINS THIS OPINION.
 

 The Complaint named as defendants Mitchell Beverage, LLC, Mitchell Rex Distributing, LLC, and Mitchell Distributing Company, Inc. The Complaint also referred to these separate entities collectively and did not specify the relationships of each entity. For this opinion, I adopt the collective identification of these entities as "the Mitchell Companies."
 

 The reference to a "designated member" under the analysis of Section 67-7-13(2) is not relevant. Adams was the intended transferee and was clearly a "transferee other than a designated member." Miss. Code. Ann. § 67-7-13(2).